**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JOHN WILLIAMS               )
                                 )
Plaintiff,                   )
                                 )  Case No. _____
v.                          )
                                 )
CENLAR FSB.             )
                                 )
Defendants            )
                                 )

**COMPLAINT**

Plaintiff, John Williams ("Plaintiff"), by and through undersigned counsel, bring this action against Cenlar FSB ("Cenlar" or "Defendant").

**NATURE OF THE CASE**

1.      This Complaint is filed and these proceedings instituted against Defendant under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601 *et. seq.*, to recover actual, statutory, and punitive damages, court costs, and attorney's fees by reason of the Defendant's violations of 12 U.S.C. §2605 and Regulation X, 24 C.F.R. §3500.1 *et. seq*., the Fair Debt Collection Practices Act, 15 U.S.C. 1692, et seq. (the "FDCPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2("ICFA")  Plaintiff also seeks declaratory relief pursuant to 28 U.S.C. §§2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, and appropriate injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure in order to prevent irreparable harm.

2.      Through its own bungled recordkeeping, Cenlar failed to update Plaintiff's mortgage account after he entered into a loan modification agreement and failed to correct errors related to his escrow account. As a result of these errors, Cenlar falsely and mistakenly put the

Plaintiff's mortgage loan into default and loss mitigation status despite the fact that the Plaintiff paid faithfully on his loan. After Cenlar falsely and mistakenly put Plaintiff's loan into default, Cenlar stopped accepting Plaintiff's payments and, upon information and belief, has begun the process of foreclosing on Plaintiff's home. Further, Cenlar has yet to respond properly to "qualified written requests" by and on behalf of the Plaintiff, and has failed to take corrective action with respect to the servicing of the Plaintiff's mortgage loan. This action also is predicated upon Defendants' conversion of Plaintiff's loan payments and its negligence as well as unfair and deceptive behavior towards Plaintiff and other consumers in Illinois.

**JURISDICTION**

3.     This Court has jurisdiction over this action pursuant to 12 U.S.C. § 2614) and 28 U.S.C. § 1331, and has supplemental jurisdiction of the state law claims regarding the same transaction and events under 28 U.S.C. § 1367(a).

4.     Venue is proper in this District because parts of the acts and transactions occurred here, and the Defendant transacts substantial business here.

**PARTIES**

5.     Plaintiff, John Williams, is a natural person who resides in Illinois.

6.     Defendant, Cenlar FSB, is a New Jersey financial services company that conducts business in the state of Illinois. Cenlar services numerous loans which are "federally related mortgage loans" as defined in 12 U.S.C. §2602, in that they are secured by a lien on residential real property designed principally for the occupancy of from one to four families, and in that they are made by "creditors" which make or invest in residential real estate loans aggregating more than $1,000,000 per year. Plaintiff's loan is one such loan.

## FACTS SUPPORTING CAUSES OF ACTION

**A.      The Loan and the Loan Modification:**

7.      On June 25, 2016, Plaintiff closed on a residential real estate loan (the "Loan") on his home located at 8635 S. Houston Ave, Chicago, IL 60617 (the "Property").

8.      To evidence the Loan, Plaintiff executed a promissory note (the "Note") in favor of CitiMortgage, Inc. (the "Lender"), and provided a security interest in the Property by executing a mortgage (the "Mortgage").

9.      After closing on the Loan, the Lender assigned servicing responsibilities of the Note and Mortgage to Cenlar.

10.      After closing on the Loan, Plaintiff began faithfully making payments to Cenlar on his Loan.

11.      When the COVID-19 pandemic began, Plaintiff suffered economically and fell behind on his mortgage payments.

12.      On July 10, 2020, Plaintiff entered into a Loan Modification Agreement with the Lender.

13.      On July 24, 2020, Plaintiff received correspondence from Cenlar notifying him that the Loan Modification was complete and providing him with a certified copy of the fully executed Loan Modification Agreement (the "Loan Modification"). A true and correct copy of the Loan Modification is attached hereto as Exhibit A.

14.      The Loan Modification provided that beginning August 1, 2020, Plaintiff's principal and interest payments on his Loan would be $624.21 per month, that interest would accrue at 3.875% and the Note would mature on July 1, 2050.

15.     The Loan Modification also provided that Plaintiff would pay any escrow shortages over a 12-month period, not in a single lump sum payment.

**B.    Cenlar's Servicing of Plaintiff's Modified Loan and Error Ridden Periodic Statements**

16.     On August 3, 2020, Cenlar sent Plaintiff a monthly mortgage statement (a "Periodic Statement"). A true and correct copy of the August 3, 2020, Periodic Statement is attached hereto as Exhibit B.

17.     The August 3, 2020, Periodic Statement stated that Plaintiff owed $4,972.72. The breakdown of charges were as follows:

      A.  Principal: $196.19

      B.  Interest: $428.02

      ***C.  Escrow (for Taxes and Insurance): $1,797.15***

      ***D.  Overdue Amount: $2,934.94***

18.     The August 3, 2020 Periodic Statement thus properly charged Plaintiff the principal and interest payments, but also demand Plaintiff pay $1,797.15 in improper escrow charges, and, inexplicably, $2,934.94 in "overdue amount" less than a week after the Loan Modification was finalized.

19.     Struck by the error and the massive bill, Plaintiff contacted Cenlar by phone to inquire why there was an overdue payment less than a week after his Loan Modification and to question the amount demanded for escrow.

20.     The Cenlar representative said they would "fix the error."

21.     On September 1, 2020, Cenlar sent Plaintiff the Periodic Statement for September 2020. A true and correct copy of the September 1, 2020, Periodic Statement is attached hereto as Exhibit C.

22.     By the September 1, 2020, Periodic Statement, Cenlar charged Plaintiff a total of $7,494.05 comprised of the proper Principal and Interest payment of $624.21 and an additional $1,797.15 for "Escrow" and an "Overdue Amount" of $4,972.72.

23.     The September 1, 2020 Periodic Statement also contains a separate fee for "attorneys fees" in the amount of $75.00. However, attorneys' fees are not allowed to be charged by a loan servicer for a loan modification under RESPA.

24.     The September 1, 2020, Periodic Statement also states that Cenlar received a $5,818.00 "insurance refund" that was never credited to Plaintiff's account.

25.     The September 1, 2020, Periodic Statement does not state that Plaintiff owed his Periodic Payment for August 2020.

26.     Again, Plaintiff contacted Cenlar by phone regarding the exact same escrow error and the nearly $5,000.00 in overdue amounts just over a month after his Loan Modification.

27.     The Cenlar representative stated explicitly that they were looking into it and would "fix the error."

28.     On October 1, 2020, Cenlar sent Plaintiff a Periodic Statement for October. A true and correct copy of the October 1, 2020, Periodic Statement is attached hereto as Exhibit D.

29.     In the October 1, 2020, Periodic Statement, Cenlar demanded that Plaintiff pay $7,354.93. In the October 1, 2020, Periodic Statement, Cenlar appeared to correct the escrow issue by charging Plaintiff only $496.30 but failed to correct the errors in the prior Periodic Statement and still demanded $6,193.20 in "Overdue Amounts."

30.     The October 1, 2020, Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

5

31.     The October 1, 2020 Periodic Statement contains a $16.25 fee for "property inspect." (sic). The inspection was never disclosed to Plaintiff and, upon information and belief, the inspection never occurred.

32.     The October 1, 2020, Periodic Statement also contains a notification that Plaintiff had an unpaid balance for August and September, 2020 of $2,421.36 for each month.

33.     On October 7, 2020, Plaintiff made a timely payment in the amount of $1,129.51, which was the precise amount necessary to pay his monthly Periodic Payment plus a $9.00 "phone pay fee," which was reflected on the November Periodic Statement.

34.     On October 9, 2020, Plaintiff made an additional payment in the amount of $1,129.51, which was the precise amount necessary to pay his monthly Periodic Payment plus a $9.00 "phone pay fee," which was reflected on the November Periodic Statement.

35.     Instead of crediting the October 7, 2020, and October 9, 2020, payments to prior months, Cenlar deposited the funds into an "Unapplied Funds" account, also known as a suspense account, and did not credit the payments to his monthly payment obligations.

36.     On November 2, 2020, Cenlar provided Plaintiff the Periodic Statement for November 2020. The November 2, 2020, Periodic Statement is attached hereto as Exhibit E.

37.     In the November 1, 2020, Periodic Statement, Cenlar charged Plaintiff a total of $8,491.69, which was comprised of the appropriate Principal, Interest and Escrow amounts totaling $1,120.51, but continued to charge Plaintiff for an "Overdue Amount" of $7,336.93 less than three months after his Loan Modification after which the appropriate monthly charges was $1,120.51.

38.     The November 1, 202 Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

6

39.     The November 1, 2020 Periodic Statement contains another "property inspect" (sic) fee of $16.95. Plaintiff was never notified of an inspection and upon information and belief no such inspection occurred.

40.     Despite having made two payments in October, the November 1, 2020, Periodic Statement states that:

    A.  Payment due 08/01/20: Unpaid balance of $2,421.36

    B.  Payment due 09/01/20: Unpaid balance of $2,421.36

    C.  Payment due 10/01/20: Unpaid balance of $1,120.51

    D.  Payment due 11/01/20: Unpaid balance of $1,12051

    E.  Current Payment due 12/01/20: $1,120.51

41.     Cenlar thus failed to credit Plaintiff's account for the October 7, 2020 and October 9, 2020 payments. Cenlar did, however, charge Plaintiff a $9.00 "Phone Pay Fee" for each of these payments.

42.     On November 23, 2020, Plaintiff made the required payment of $1,120.51.

43.     Instead of applying Plaintiff's November 23, 2020 payment to his monthly payment obligation, Cenlar deposited the funds into a suspense account.

44.     On November 30, 2020, Cenlar sent Plaintiff a letter (the "Notice of Default") notifying him that Cenlar considered his Loan to be in default. A true and correct copy of the Notice of Default is attached hereto as Exhibit F.

45.     The Notice of Default demanded that Plaintiff pay $3,772.15 for his "failure to pay the monthly mortgage payments due beginning September 1, 2020."

46.     Thus, according to Cenlar, as of November 30, 2020, Plaintiff's past due amount was $3,772.15.

47.     On December 1, 2020, Cenlar provided Plaintiff his December 2020 Periodic Statement. A true and correct copy of the December 1, 2020 Periodic Statement is attached hereto as Exhibit G.

48.     The December 1, 2020, Periodic Statement demanded that Plaintiff pay $7,332.09. The payment breakdown was comprised of the appropriate Principal, Interest and Escrow amounts totaling $1,120.51, but also demanded $6,195.33 for an "Overdue Amount."

49.     The December 1, 2020 Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

50.     Additionally, in the December 1, 2020 Periodic Statement, Cenlar stated that Plaintiff's November 23, 2020 payment was a "partial/unapplied paymt" (sic) that was not timely credited to his account and was deposited into a suspense account.

51.     For the third time, Plaintiff's December 1, 2020 Periodic Statement contained a "Property Inspect" fee in the amount of $16.25.

52.     Despite the fact that Plaintiff had made $3,379.53 since his Loan Modification in August of 2020, the December 1, 2020 Periodic Statement also states that:

      A.  Payment due 8/20: Fully paid on 11/24/20

      B.  Payment due 09/01/20: Unpaid balance of $2,421.46

      C.  Payment due 10/1/20: Unpaid balance of $1,120.51

      D.  Payment due 11/01/20: Unpaid balance of $1,120.51

      E.  Payment due 12/01/20: Unpaid balance of $1,120.51

      F.  Current Payment due 01/01/21: $1,120.51.

53.     On January 4, 2021, Cenlar provided Plaintiff with his Periodic Statement for January 2021. A true and correct copy of the January 4, 2021 Periodic Statement is attached hereto as Exhibit H.

54.     In the January 4, 2021 Periodic Statement, Cenlar demanded $8,467.80 comprised again of the $1,120.51 Principal, Interest and Escrow payment, but increased its demand for an "Overdue Amount" to $7,332.09.

55.     The January 4, 2021 Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

56.     The January 4, 2021 Periodic Statement also contains a fourth "Property Inspect" fee of $15.00.

57.     Inexplicably, in the January 4, 2021 Periodic Statement, Cenlar asserts that Plaintiff has the following unpaid balances:

    A.  Payment due 09/01/20: Unpaid balance of $2,421.36.

    B.  Payment due 10/01/20: Unpaid balance of $1,120.51.

    C.  Payment due 11/01/20: Unpaid balance of $1,120.51.

    D.  Payment due 12/01/20: Unpaid balance of $1,120.51.

    E.  Payment due 01/01/21: Unpaid balance of $1,120.51.

    F.  Current Payment due 02/01/21: $1,120.51

58.     Thus, even though Plaintiff had made at least three post-Loan Modification Payments – the October 7, 2020, October 9, 2020 and November 23, 2020 payments - Cenlar failed to credit his account for at least two of those payments.

59.     Beginning with his December 2020, payment, Cenlar rejected Plaintiff's Periodic Payment.

60.     On December 31, 2020, Plaintiff called Cenlar to inquire why his payment was rejected. A representative of Cenlar told him that his escrow re-analysis was complete and he needed to speak with a loan counselor to adjust the owed payments to match his Loan Modification.

61.     On January 4, 2021, Plaintiff spoke with "Ebony" at Cenlar – Employee ID 8121. Ebony explained that his payments would remain $2,421.36 (more than twice the amount they had billed him for the preceding few months), that the escrow re-analysis was not complete, that the negative credit reporting Cenlar had made to the credit reporting agencies would be corrected once the escrow re-analysis was complete and he caught up on payments, and that customer service would be calling him in 24-48 hours. That call never came.

62.     On January 29, 2021, Plaintiff sent a check to Cenlar for his next Periodic Payment.

63.     On February 1, 2021, Cenlar provided Plaintiff with his Periodic Statement for February 2021. A true and correct copy of the February 1, 2021 Periodic Statement is attached hereto as Exhibit I.

64.     In the February 1, 2021 Periodic Statement, Cenlar demanded $9,538.17 comprised again of the $1,120.51 Principal, Interest and Escrow payment, but increased its demand for an "Overdue Amount" to $8,417.66.

65.     The February 1, 2021 Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

66.     In the February 1, 2021 Periodic Statement, Cenlar asserts that Plaintiff has the following unpaid balances:

    A.  Payment due 09/01/20: Unpaid balance of $2,421.36.

10

B.   Payment due 10/01/20: Unpaid balance of $1,120.51.

C.   Payment due 11/01/20: Unpaid balance of $1,120.51.

D.   Payment due 12/01/20: Unpaid balance of $1,120.51.

E.   Payment due 01/01/21: Unpaid balance of $1,120.51.

F.   Current Payment due 02/01/21: $1,120.51

67.     On February 11, 2021, Cenlar returned the Plaintiff's January 29, 2021 payment "because it is not sufficient to bring your loan current. As of the date of this letter, the amount required to bring your loan current is $8,417.66." A true and correct copy of the February 11, 2021 Letter is attached hereto as Exhibit J.

68.     On March 1, 2021, Cenlar provided Plaintiff with his Periodic Statement for March 2021. A true and correct copy of the March 1, 2021 Periodic Statement is attached hereto as Exhibit K.

69.     In the March 1, 2021 Periodic Statement, Cenlar demanded $10,683.65 comprised again of the $1,120.51 Principal, Interest and Escrow payment, but increased its demand for an "Overdue Amount" to $9,538.17.

70.     The March 1, 2021 Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

71.     Even though Cenlar rejected Plaintiff's January 29, 2021 payment, in the March, 2021 Periodic Statement, Cenlar asserts that Plaintiff has the following unpaid balances:

A.   Payment due 11/01/20: Unpaid balance of $1,120.51.

B.   Payment due 12/01/20: Unpaid balance of $1,120.51.

C.   Payment due 01/01/21: Unpaid balance of $1,120.51.

D.   Payment due 02/01/21: Unpaid balance of $1,120.51.

E.  Payment due 03/01/21: Unpaid balance of $1,120.51

F.  Payment due 02/01/21: Unpaid balance of $1,120.51.

G.  Payment due 03/01/21: Unpaid balance of $1,120.51

H.  Payment due 04/01/21: Unpaid balance of $1,120.51.

I.  Current Payment due 05/01/21: $1,120.51

72.     Cenlar thus either credited Plaintiff another $1,120.51 payment without notifying Plaintiff of the accounting error or other error and while still rejecting Plaintiff's payments, or simply left the previously paid October 1, 2020 past due amount off the periodic statement.

73.     Cenlar also charged Plaintiff a two-$150.00 "Property Inspect" fees.

74.     On March 8, 2021, Cenlar sent Plaintiff a loss mitigation letter (the "Loss Mitigation Letter"). A true and correct copy of the Loss Mitigation Letter is attached hereto as Exhibit L.

75.     The Loss Mitigation Letter falsely states that "[w]e are sending this notice to you because you are behind on your mortgage payments." The Loss Mitigation Letter also falsely asserts Cenlar's right to foreclose on the Plaintiff's Property and encourages him to consider non-retention loss mitigation options to keep his home.

76.     On March 19, Plaintiff again called Cenlar to inquire as to why he was getting loss mitigation letters and threats of foreclosure while Cenlar was supposed to be re-analyzing and fixing his escrow account. He spoke with three different representatives of Cenlar.

77.     First, he spoke to "Ms. Writtenhalf" Employee ID 0715. Ms. Writtenhalf was no help, refused to speak with Plaintiff and transferred him to "Jennie;" Employee ID 3920.

12

78.     Jennie informed Plaintiff that Cenlar was "working on the escrow for September and November re-analysis and expected a correction to cover August to October." Jennie then transferred Plaintiff to "Mr. Brooks;" Employee ID 4620.

79.     Mr. Brooks was supposed to help Plaintiff put in a request to change the payments from August to October to match the payments agreed to by Cenlar in the Modification. Mr. Brooks told Plaintiff the analysis and request would take a month.

80.     On April 1, 2021, provided Plaintiff with his Periodic Statement for February 2021. A true and correct copy of the April 1, 2021 Periodic Statement is attached hereto as Exhibit M.

81.     In the April 1, 2021 Periodic Statement, Cenlar demanded $11,859.13 comprised again of the $1,120.51 Principal, Interest and Escrow payment, but increased its demand for an "Overdue Amount" to $10,708.62.

82.     The April 1, 2021 Periodic Statement states "[f]ailure to bring your loan current may result in fees and foreclosure – the loss of your home."

83.     In the April 1, 2021 Periodic Statement, Cenlar asserts that Plaintiff has the following unpaid balances:

        A.  Payment due 10/01/20: Unpaid balance of $1,120.51.

        B.  Payment due 11/01/20: Unpaid balance of $1,120.51.

        C.  Payment due 12/01/20: Unpaid balance of $1,120.51.

        D.  Payment due 01/01/21: Unpaid balance of $1,120.51.

        E.  Current Payment due 02/01/21: $1,120.51

84.     Thus, according to Cenlar, four months after his Loan Modification, with a monthly payment of $1,120.51, Cenlar alleged that Plaintiff was somehow more than $7,000.00

delinquent on his mortgage payments despite the fact that he had made each payment, and by April 2021 just seven months after his Loan Modification, Cenlar alleged Plaintiff was nearly $12,000.00 delinquent in his payments.

85.     On April 21, 2020, Plaintiff called Cenlar again. He spoke with "Ms. Bennet;" Employee ID 41803. She explained  that the payments owed on the account still reflected $2,42136 and that the request Mr. Brooks purportedly put into the system on March 19, 2021 were not showing in her system and had not been fulfilled.

86.     Ms. Bennet transferred Plaintiff to "Lindsey;" Employee ID LMTAG. Lindsey informed Plaintiff that he was required to pay $10,000 for September through April and then abruptly transferred Plaintiff to an unknown department wherein his line was disconnected.

87.     Plaintiff's credit reports from all three major credit reporting agencies reflect that beginning in September 2020 and through the date of this filing, Cenlar has been falsely reporting to the credit reporting agencies that his loan is delinquent between 30 days and 180 days.

88.     Between August 2020 and April 2021, Plaintiff has spent countless hours on the phone with Cenlar representatives attempting to rectify the issues with his escrow account, the pyramiding fees and excessive charges. At every turn, Cenlar has been non-responsive or unwilling to correct its errors.

89.     Between August 2020 and April 2021, Cenlar refused to correct the initial over charges on Plaintiff's escrow account, charged Plaintiff for a "property inspect" fee six times without ever performing an inspection, failed to credit an insurance refund to his escrow account, charged plaintiff for attorneys' fees that are not chargeable for a loan modification, improperly placed Plaintiff's payments in a suspense account without applying the funds to Plaintiff's

14

account, charged hundreds of dollars in improper late fees, improperly defaulted Plaintiff's loan based on its own errors and failure to correct them, and then threatened Plaintiff with foreclosure because it failed to correct its own errors after it provided Plaintiff a Loan Modification.

90.     On May 27, 2021, Plaintiff sent a qualified written request" and "notice of error" to Cenlar. Cenlar has failed to respond to the letter. A true and correct copy of the Notice of Error is attached hereto as Exhibit N. Cenlar has failed to respond or acknowledge the Notice of Error.

## C.     *Damage to Plaintiff*

91.     Since receiving the first post-Loan Modification Periodic Statement in September of 2020, Plaintiff has suffered great emotional distress. He became angry and was constantly frustrated because he believed that the Loan Modification with Cenlar was the most appropriate way to honor his obligations to Cenlar while suffering financially during the COVID-19 pandemic, and Cenlar wasn't holding up its end of the bargain.

92.     Plaintiff was embarrassed that a public record of a foreclosure case could exist at any moment and feared that his family, neighbors, friends and colleagues would learn of the filing and hold him in low esteem.

93.     If Cenlar proceeded with foreclosure – even improperly – the foreclosure case would be a scarlet letter, that cannot be erased and will forever haunt Plaintiff in his future endeavors.

94.     While Plaintiff attempted to work with Cenlar to correct its errors, Plaintiff suffered many sleepless nights, became agitated, could not focus on work and could not enjoy the normal comforts of life.

95.     Finally, in April 2021, Plaintiff put aside his anxiety, fear and embarrassment and sought the advice of attorneys.

96.     Plaintiff retained counsel to represent him in his efforts to work with Cenlar and to help him seek redress by filing the instant action.

97.     Plaintiff has incurred court costs and filing fees, attorneys fees and costs to consult with him, to review his records regarding the Loan and to have his attorneys prepare and serve a qualified written request and notice of error.

98.     The actions of Defendant has further caused damage to Plaintiff's credit.

99.     The false reports to credit reporting agencies has resulted in (a) a rejected credit application for a car loan, (b) a rejected loan application for a continuing education boot camp which would have opened opportunities and resulted in higher pay for Plaintiff, and (c) five missed opportunities at his current employer wherein, had he been able to attend the continuing education boot camp, he would have qualified to apply for a promotion. Those positions have subsequently been filled by outside candidates.

100.    The actions of Defendant has caused Plaintiff to incur actual damages including time off work, travel expenses to and from his attorney's office, filing fees, attorneys' fees to send the qualified written request and notice of error, and the preparation and prosecution of this action.

101.    Cenlar, after more than 8 months, has failed to provide Plaintiff an accounting of his escrow account.

## CAUSES OF ACTION

### COUNT I - TILA

### (Violation of TILA (Reg. Z § 1026.36(c)(2))

102.     Plaintiff restates all prior paragraphs as though fully set forth herein.

103.     Cenlar is a loan "servicer" as that term is defined in 12 CFR § 1024.2(b)(22)(5).

104.     Cenlar failed to timely credit Plaintiff's payments on his account.

105.     Cenlar charged "pyramiding" late fees to Plaintiff by charging a late fee even though Plaintiff's monthly payments were sufficient to cover the principal and interest owed under the Loan.

106.     Reg. Z. § 1026.36(c)(2) states explicitly that "in connection with a closed-end consumer credit transaction secured by a consumer's principal dwelling, a servicer shall not impose any late fee or delinquency charge for payment if:

    **(i)** Such a fee or charge is attributable solely to failure of the consumer to pay a late fee or delinquency charge on an earlier payment; and

    **(ii)** The payment is otherwise a periodic payment received on the due date, or within any applicable courtesy period."

107.     The Mortgage, the CFPB, the FTC and the FRB consistently define a periodic payment as payment of interest and principal on the note when due.

108.     Thus, Cenlar was not justified in charging late penalties for Plaintiff's failure to make additional payments for late fees, annual fees or finance charges that were not properly chargeable to his account.

109.     Further, Cenlar's failure to timely credit Plaintiff's account caused him to pay more in principal and interest payments than he actually owed, and to pay unnecessary.

110.     On at least October 7, 2020, October 9, 2020, November 23, 2020 and January 29, 2021, Cenlar violated TILA's Reg. Z by failing to promptly credit Plaintiff's periodic payments.

111.     Defendants' improper charges to Plaintiff's account and failure to properly and timely apply Plaintiff's payments are thus a violation of TILA's Reg. Z.

112.    Plaintiff has suffered damage resulting from Defendants' violation of TILA's Reg. Z.

**WHEREFORE**, the Plaintiff requests that the Court:

A.  Grant judgment in the Plaintiff's favor against Defendant;

B.  Award the Plaintiff actual and statutory damages in an amount to be determined at trial;

C.  Award Plaintiff's reasonable attorneys' fees and costs; and

D.  Award any other relief the Court deems equitable and just.

## COUNT II - RESPA

### (Violations of RESPA, 12 U.S.C. § 2605 and 24 C.F.R. §3500)

113.    Plaintiff restates all prior paragraphs as though fully set forth herein.

114.    Defendant is a servicer of a federally related mortgage loan within the meaning of RESPA.

115.    Defendant has repeatedly and consistently failed to provide accurate and timely information to Plaintiff regarding the improper balance of his escrow account.

116.    Defendant's failure to provide accurate and timely information to Plaintiff regarding the escrow account has caused Defendant to improperly charge Plaintiff for amounts he did not owe, which, in turn, caused Defendant to fail to properly credit Plaintiff's account and instead hold his periodic payments in a suspense account, which, in turn, cause Defendant to charge fees and penalties that were not properly charged and Plaintiff does not owe.

117.    Defendant also failed to timely notify Plaintiff of his loss mitigation options in violation of RESPA, which requires a servicer to notify a borrower of loss mitigation options by the 45th day of a borrower's delinquency. Indeed, by the time Defendant sent its first loss

mitigation letter to Plaintiff, it had already sent the Notice of Default and was reporting to the credit reporting agencies that Plaintiff was 90 days delinquent on his loan.

118.     Plaintiff's written requests for information about his account and correction of Defendant's numerous errors were "qualified written requests" within the meaning of RESPA.

119.     Defendant failed to respond in a proper and timely way to Plaintiff's "qualified written requests" for information about, and corrections to, his Mortgage account, in violation of 12 U.S.C. § 2605(e)(2)(A).

120.     Defendant failed to make appropriate corrections to Plaintiff's account in response to the qualified written request, including the crediting of any late charges or penalties, and failing to transmit written notice of such corrections to Plaintiff no later than 60 days after receipt of Plaintiff's qualified written request in violation of § 2605(e)(2)(A) of RESPA.

121.     Defendant failed to provide Plaintiff with the information and documentation requested, or an explanation why the information sought was unavailable, no later than 60 days after receipt of Plaintiff's Qualified Written Request in violation of § 2605(e)(2)(C) of RESPA.

122.     Defendant violated RESPA, 12 U.S.C. 2605(e)(3), by providing information to consumer reporting agencies regarding overdue payments allegedly owed by Plaintiff that were related to his Qualified Written Request.

123.     Defendant failed to correct Plaintiff's account in violation of 12 U.S.C. §2605(e)(2) and 24 C.F.R. §3500.21(e)(3) (1996).

124.     Defendant reported to credit reporting agencies that Plaintiff was overdue and delinquent, in violation of U.S.C. §2605(e)(4)(i).

125.    Defendant refused to cease its collection efforts and demands by letter and telephone collection harassment after receiving qualified written request letters from or on behalf of Plaintiff, in violation of 12 U.S.C. §2605(e)(2).

126.    Defendant failed to conduct an appropriate investigation after receiving qualified written request letters from or on behalf of Plaintiff, in violation of 12 U.S.C. §2605(e)(2).

127.    Defendant has engaged in a pattern or practice of non-compliance with the requirements of the mortgage servicing provisions of RESPA as set forth in 12 U.S.C. §2605.

128.    Plaintiff has suffered extensive damages, including but not limited to an unlawfully increased loan balance, being required to pay interest that was not owed, diminished credit prospects due to Defendants' false credit reporting, and aggravation and inconvenience due to Defendants' continual failure to correct its own errors in regard to Plaintiff's loan.

**WHEREFORE**, the Plaintiff requests that the Court:

    A.    Grant judgment in the Plaintiff's favor against Defendants;

    B.    Award Plaintiff actual, punitive and statutory damages in an amount to be determined at trial;

    C.    Award Plaintiff reasonable attorneys' fees and costs; and

    D.    Award any other relief the Court deems equitable and just.

## COUNT III – NEGLIGENCE

129.    Plaintiff restates all prior paragraphs as though fully set forth herein.

130.    Defendant owed a duty to Plaintiff to service the Loan in conformity with Federal and state laws regarding servicing of a loan secured by a borrower's primary residence and to refrain from making or taking false, deceptive or unfair acts and/or statements in the service of the Loan.

131.    Defendant breached its duty to Plaintiff by charging Plaintiff amounts that he does not owe, failing to credit his payments to his account, disregarding Plaintiff's statements that he had been unfairly charged, ignoring his Notice of Error, harassing and intimidating Plaintiff and placing his Loan in loss mitigation status under false pretenses.

132.    Defendant's actions are the direct and proximate cause of damages suffered by the Plaintiff.

133.    Plaintiff has suffered actual monetary damages as well as pain and suffering as a result of Defendant's conduct.

**WHEREFORE**, the Plaintiff requests that this Honorable Court:

    A.  Grant judgment in his favor against Defendants;

    B.  Award Plaintiff actual and punitive damages in an amount to be determined at trial;

    C.  Award Plaintiff's reasonable attorneys' fees and costs; and

    D.  Award any other relief this Honorable Court deems equitable and just.

## COUNT IV – ICFA

### (Violations of ICFA, 815 ILCS 505, *et seq.*)

124.    Plaintiff restates all prior paragraphs as though fully set forth herein.

125.    Plaintiff contracted with Lender any by assignment Cenlar for the provision of mortgage loan services for his personal use.

126.    Plaintiff used the proceeds of the subject loan to pay for and improve the Property, which he occupied as his personal residence.

127.    Plaintiff is thus a "consumer" as defined under Sections 1(c) and (e) of ICFA.

128.    Plaintiff is also a "person" as defined under Sections 1(c) and (e) of ICFA.

129. Section 2 of ICFA prohibits unfair or deceptive practices and states, in relevant part, as follows:

> **Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact, or the use or employment of any practice described in section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.**

130. At all relevant times, Defendant was engaged in trade or commerce of loan servicing within Illinois.

131. Defendant provided its loan servicing services directly to Plaintiff who made his payment to and communicated with Cenlar regarding his Loan.

132. Cenlar acted as the agent for Lender and dealt with Plaintiff directly on Lender's behalf.

133. Cenlar's actions were used by Lender in an effort to collect amounts alleged to be owed under the Loan.

134. Specifically, Cenlar's deceptive and unfair practices and acts were done in a deliberate effort to bully and intimidate Plaintiff into abandoning his rights to the Property so that the property could be sold as collateral for the Mortgage, with the proceeds being used to satisfy amounts alleged to be outstanding on the Loan.

135. While engaged in trade or commerce, Defendant committed the unfair acts or practices set forth below. These acts or practices were carried out without legal or factual basis, in direct contravention of Federal and Illinois law, and in violation of internal and regulatory guidelines.

136.   It was unfair for Cenlar to:

A.   Violate RESPA by refusing to cease its collection efforts and instead initiating loss mitigation and threatening foreclosure after receiving Plaintiff's Qualified Written Request;

B.   Violate RESPA by providing information to consumer reporting agencies regarding overdue payments allegedly owed by Plaintiff that were related to his Qualified Written Request;

C.   Violate RESPA by failing to correct Plaintiff's account;

D.   Violate RESPA by reporting to credit reporting agencies that Plaintiff was overdue and delinquent in payment of his Loan;

E.   Violate RESPA by refusing to cease its collection efforts and demands by letter and telephone collection harassment after receiving qualified written request letters from or on behalf of Plaintiff;

F.   Violate RESPA by refusing to conduct an investigation after receiving qualified written request letters from or on behalf of Plaintiff;

G.   Violate RESPA by engaging in a pattern and practice of non-compliance with the requirements of the mortgage servicing provisions of RESPA;

H.   Violate TILA by pyramiding late fees and improperly applying Plaintiff's Periodic Payments

I.   Violate the FCRA by making false and defamatory reports to credit reporting agencies regarding Plaintiff's account status;

J.   Violate the FDCPA by sending account statements and letters to Plaintiff that incorrectly asserted the amount of the debt he owed;

K.   Ignore written correspondence from Plaintiff explaining that he made timely periodic payments;

L.   Ignore Plaintiff's verbal and written notices that he paid his periodic payment and failing to timely credit his account;

M.   Ignore Plaintiff's demand that it review his account and fix servicing and accounting errors;

N.   Ignore proof of payment by Plaintiff;

O.   Ignore Plaintiff's Qualified Written Requests;

23

P.  Pyramid late charges on Plaintiff's account despite actual knowledge that such charges were not chargeable;

Q.  Charge late fees that were improper;

R.  Charge property inspection fees that were improper;

S.  Refuse to correct the initial over charges on Plaintiff's escrow account;

T.  Fail to credit an insurance refund to Plaintiff's escrow account;

U.  Fail to provide Plaintiff with a timely loss mitigation letter;

V.  Charge plaintiff for attorneys' fees that are not chargeable for a loan modification;

W.  Improperly place Plaintiff's payments in a suspense account without applying the funds to Plaintiff's account;

X.  Threaten Plaintiff with foreclosure because it failed to correct its own errors after it provided Plaintiff a Loan Modification;

Y.  Engage in a pattern and practice of subverting Illinois law and Federal law through predatory lending and servicing practices; and

Z.  Engage in a pattern and practice of using intimidation, bullying, trickery, and false statements to encourage consumers to abandon their property rights and to evade compliance with RESPA, TILA and FCRA.

137.  Defendant committed additional unfair acts and practices by:

A.  Failing to adequately train, manage, or supervise employees to ensure compliance with the law in the performance of loan servicing;

B.  Failing to provide training with respect to the Illinois Mortgage Foreclosure Law and Illinois law;

C.  Failing to ensure that loan servicing instructions, policies, manuals, and procedures are transmitted to and reviewed by every employee in the services chain; and

D.  Creating an internal system where in employees are contractually required to perform loan servicing services that violate Illinois law and Federal law.

138. Cenlar understands that any orders to improperly service a loan in violation of RESPA and TILA, to make negative reports to a credit reporting agency in violation of FCRA, and fail to investigate, respond to and address servicing errors directly contradicts the requirements of Federal and Illinois law and regulatory guidelines. Cenlar's own methods ensure that operating in this manner will violate the protections afforded to consumers by Federal and Illinois law.

139. The foregoing conduct is part of a pattern and practice of behavior in which Cenlar routinely engages as part of its business models. Its normal business practices are designed to disregard the law through an agreement to subvert the federal and Illinois law, ignore the possessory and ownership rights of consumers, and profit from initiating foreclosure proceedings to coerce a borrower into giving up his property rights in his personal and real property when such action is unwarranted.

140. Cenlar's practices offend public policy, have a direct consumer nexus, affect consumers as a whole, and violate the basic possessory rights of consumers. These practices directly implicate consumer protection concerns because the conduct impacts and threatens consumers' home ownership and possessory rights and causes substantial emotional and financial harm to consumers by subverting legal protections afforded to Illinois residents.

141. Further, consumers rightfully expect that businesses purporting to "service" their loans and mortgages will not (a) charge consumers amounts that they do not owe, (b) divert payments by consumers into suspense accounts and not credit such payments to the consumers' accounts, (c) ignore a consumers' statements that they have been unfairly charged, (d) ignore qualified written requests or CFPB complaints, (e) place a loan in loss mitigation status without the right to do so, and (f) harass or intimidate consumers.

25

142.     These practices are immoral, unethical, oppressive, and unscrupulous, and demonstrate an industry-wide practice of maximizing profits by intimidating consumers, ignoring consumers' legal rights, and profiting from foreclosures against consumers who give up on enforcing their rights in the face of such actions.

143.     These practices are an effort by Cenlar to prevent consumers from having effective legal representation by ignoring communications from consumers.

144.     The repeated practice of failing to properly allocate periodic payments and sending periodic statements to Plaintiff containing invalid late fees, annual fees, improper finance charges, improperly calculated interest and making demand for payments already made demonstrates a pattern of flouting state-mandated laws and public policies designed to protect Illinois residents generally.

145.     The conduct herein would equally violate the basic possessory rights of any other consumer who has been subjected to these practices. Any residential property owner who is subjected violations of TILA, RESPA, FCRA and the FDCPA will experience a violation of his rights or suffer harm, and likely both.

146.     Cenlar intended that Plaintiff rely upon its actions and to bully him into giving up possessory rights so Cenlar could monetize the subject property for the Lender's benefit.

147.     Cenlar's actions were deceptive and unfair and were designed to bully Plaintiff into making additional payments that he did not owe under the Note and Mortgage and to bully Plaintiff into giving up his possessory rights to the Property.

148.     Plaintiff suffered damages as a result of Cenlar's misconduct, including as set forth above.

**WHEREFORE**, Plaintiff requests that the Court:

A. Grant judgment in Plaintiff's favor against Cenlar;

B. Award Plaintiff actual and punitive damages in an amount to be determined at trial;

C. Award Plaintiff's reasonable attorneys' fees and costs pursuant to Section 10a(c) of the Consumer Fraud and Deceptive Business Practices Act; and

D. Award any other relief the Court deems equitable and just.

### COUNT V

### (Violations of the FDCPA, 15 U.S.C. § 1692)

151. Plaintiff restates all prior paragraphs as though fully set forth herein.

152. 15 U.S.C. 1692e provides in relevant part:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

(2) The false representation of–

(A) the character, amount, or legal status of any debt; . . .

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

(10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer. . . .

153. By the time, Defendant sent the Notice of Default on November 30, 2020, Defendant considered Plaintiff's Loan to be in default.

154. By the December 1, 2020 Periodic Statement up to and including the April 1, 2021, Periodic Statement, Cenlar made false, deceptive and misleading representations in

connection with the collection of a debt, in violation of §1692e, by making false and deceptive statements to Plaintiff by, at least:

    A.  Misrepresenting the amount of the debt owed by Plaintiff in violation of §1692e(2) of the FDCPA;

    B.  Misrepresenting the legal status of the debt owed by Plaintiff in violation of §1692e(2) of the FDCPA;

    C.  Threatening to take action that cannot legally be taken in violation of §1692e(5) of the FDCPA;

    D.  Misrepresenting to Plaintiff that he might lose his home in violation of §1692e(10) of the FDCPA.

155.    15 U.S.C. 1692f provides in relevant part that a debt collector "may not use unfair or unconscionable means to collect or attempt to collect any debt."

156.    Cenlar violated §1692f of the FDCPA by attempting to collect the Loan by placing the Loan into loss mitigation when it had miscalculated the amounts due by Plaintiff and refused to correct its own errors despite Plaintiff's repeated notice that the amounts demanded were incorrect.

157.    Defendant violated §§1692f and 1692f(1) of the FDCPA by attempting to collect attorneys' fees that are not owed by Plaintiff.

158.    15 U.S.C. 1692d provides in relevant part that a debt collector, "may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of the debt."

159.     Cenlar violated §1692d of the FDCPA by threatening Plaintiff vis-à-vis the

Periodic Statements, Notice of Default and Loss Mitigation Letter that failure to pay would result

in the "loss of your home" while continuing to make demand for payment from Plaintiff.

160.     Plaintiff suffered actual damages as set forth *infra*.

**WHEREFORE,** the Plaintiff prays for the entry of judgment in his favor and against Cenlar, as

follows:

A.   For Statutory damages of up to $1,000.00 for each violation of the FDCPA;

B.   For actual damages, all costs and reasonable attorney fees;

C.   For all other relief this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury.

Respectfully Submitted,

/s/ *Seth McCormick*
Seth McCormick (ARDC # 6309643)
Great Lakes Consumer Law Firm, LLC
73 W. Monroe St., Suite 100
Chicago, IL 60603
(312) 971-6787
seth@glclf.com

s/ *Bryan Paul Thompson*
Bryan Paul Thompson
Robert W. Harrer
CHICAGO CONSUMER LAW CENTER, P.C.
33 N. Dearborn St., Suite 400
Chicago, Illinois 60602
Tel. 312-858-3239
Fax 312-610-5646
bryan.thompson@cclc-law.com
rob.harrer@cclc-law.com

*Attorneys for Plaintiff*