## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JOHN WILLIAMS,

     Plaintiff,

        v.

CENLAR FSB and CITIMORTGAGE,
INC.,

     Defendants.

No. 21-cv-03271

Judge John F. Kness

## MEMORANDUM OPINION AND ORDER

Plaintiff John Williams sued Defendants Cenlar FSB and CitiMortgage, Inc. for claims arising from communications concerning mortgaged debts owed by Plaintiff. In his First Amended Complaint (Dkt. 8), Plaintiff asserts five counts under various theories: the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. and Regulation Z, 12 C.F.R. § 1026.36(c)(2) (against CitiMortgage (Count I)); the Real Estate Settlement Procedures Act (against Cenlar (Count II)); negligence (against both Cenlar and CitiMortgage (Count III)); the Illinois Consumer Fraud and Deceptive Business Practices Act (against both Cenlar and CitiMortgage (Count IV)); and the Fair Debt Collection Practices Act (against Cenlar (Count V)). Along with other relief, Plaintiff seeks actual and statutory damages.

Both Defendants have moved to dismiss all the claims against them. For the following reasons, CitiMortgage's motion is denied as to Count I and granted without prejudice as to Count III and Count IV. Cenlar's motion is denied as to Count II and

Count III and granted without prejudice as to Counts IV and V. By separate order, Plaintiff will be afforded leave to submit an amended complaint if he believes the pleading deficiencies identified below can be cured by amendment.

## I.    BACKGROUND

As alleged in the First Amended Complaint, Plaintiff John Williams closed on a residential real estate loan in June 2016 and executed a promissory note and mortgage in favor of Defendant CitiMortgage. (Dkt. 8 ¶ 9–10.) CitiMortgage assigned servicing responsibilities for the loan to Defendant Cenlar. (*Id.* ¶ 11.) Plaintiff and CitiMortgage then entered into a Loan Modification Agreement in July 2020. (*Id.* ¶ 14.) Under that Agreement, Plaintiff's principal and interest payments on the loan (beginning on August 1, 2020) were $624.21 per month, interest accrued at 3.875%, and the promissory note would mature on July 1, 2050. (*Id.* ¶ 16.) The Agreement further provided that Plaintiff would pay any escrow shortages over a twelve-month period. (*Id.* ¶ 17.)

From August 2020 to April 2021, Cenlar sent Plaintiff monthly mortgage statements ("Periodic Statements") that, Plaintiff says, listed incorrect and excessive escrow and overdue amounts as well as additional charges including attorneys' fees and property inspection fees. (*Id.* ¶ 25–83.) Although the escrow issue was corrected as of October 2020, Plaintiff alleges that, in each Periodic Statement, the demanded "overdue amounts" continued to rise. (*Id.* ¶¶ 30–31, 38–39, 55–56, 65–66, 70–71, 82–83.) Plaintiff also alleges that beginning in October 2020, Cenlar began to threaten foreclosure in each Periodic Statement, stating that "[f]ailure to bring your loan

current may result in fees and foreclosure—the loss of your home." (*Id.* ¶¶ 32, 40, 51, 57, 67, 72, 84.)

Plaintiff contends that he contacted Cenlar numerous times by phone to correct the issue, given his understanding that the Agreement was meant to cure any overdue charges and that any escrow charges should not be so high. (*Id.* ¶¶ 21, 29.) On each occasion, Cenlar representatives promised to "fix the error." (*Id.* ¶¶ 22, 29.) But on November 30, 2020, Cenlar sent Plaintiff a letter notifying him that Cenlar considered his loan to be in default and demanding an additional payment for his "failure to pay the monthly mortgage payments beginning September 1, 2020." (*Id.* ¶¶ 46–47.)

Plaintiff alleges that he made numerous timely Periodic Payments, but Cenlar, instead of crediting these payments toward his loan, deposited Plaintiff's payments into what Plaintiff calls a "suspense account." (*Id.* ¶¶ 36–37, 42–45, 60, 64.) Plaintiff alleges Cenlar simultaneously continued to assess increasing charges for "overdue amounts." (*See id.* ¶ 42.) Cenlar confusingly and arbitrarily credited some months as fully paid, others as completely unpaid, and some as partially paid or unapplied, while sometimes listing months as unpaid that had not yet occurred—all the while leaving Plaintiff's payments in the suspense account. (*Id.* ¶¶ 54, 59, 60, 73.) Plaintiff alleges that Cenlar altogether rejected some of Plaintiff's payments. (*Id.* ¶¶ 61, 69.)

On December 31, 2020, Plaintiff contacted Cenlar by phone and was told by a Cenlar representative that his escrow re-analysis was complete. (*Id.* ¶ 62.) On January 4, 2021, however, a different Cenlar representative told Plaintiff that the

escrow re-analysis was *not* complete. (*Id.* ¶ 63.) That latter representative told Plaintiff that Cenlar had been reporting negative information to outside credit agencies to the detriment of Plaintiff's credit score. (*Id.*) Cenlar's representative continued that the issue would be corrected once the escrow re-analysis was complete and Plaintiff caught up on his payments. (*Id.*)

On March 19, 2021, after receiving a loss mitigation letter from Cenlar reasserting Cenlar's right to foreclose on his home, Plaintiff again contacted Cenlar to ask why he was receiving such threats while Cenlar purported to be re-analyzing and fixing his account issues. (*Id.* ¶ 77–78.) Plaintiff spoke with three Cenlar representatives, who allegedly represented to him that he could expect, in about a month, a correction to his account. (*Id.* ¶¶ 78–81.)

Despite Plaintiff alleging that he continued to pay his monthly dues, Cenlar had by the April 2021 Periodic Statement increased its demand for Plaintiff's overdue payment to $10,708.62 and listed unpaid balances from October 2020, November 2020, December 2020, and January 2021. (*Id.* ¶¶ 82–83.) As a result, although Plaintiff made each payment, Cenlar's letters stated that Plaintiff was nearly $11,000 delinquent on his payments and was required to make monthly payments of $1,120.51. (*Id.* ¶ 86.)

Plaintiff's credit reports from all three major credit reporting agencies reflect that, beginning September 2020 and through the date of Plaintiff's filing of the First Amended Complaint, Cenlar was informing credit reporting agencies that Plaintiff's loan was delinquent between 30 days and 180 days. (*Id.* ¶ 89.) Between August 2020

4

and April 2021, Cenlar refused to correct the initial overcharges on Plaintiff's escrow account, charged Plaintiff for attorneys' fees that are not chargeable for loan modification under RESPA, improperly placed Plaintiff's payments in a suspense account without applying the funds to Plaintiff's account, charged hundreds of dollars in improper late fees, improperly defaulted Plaintiff's loan on its own errors and failure to correct them, and improperly threatened Plaintiff with foreclosure in view of the Agreement. (*Id.* ¶ 91.)

On May 27, 2021, Plaintiff sent Cenlar a "Qualified Written Request" and notice of error. (*Id.* ¶ 92; *see* Dkt. 8-1, Ex. N.) Cenlar received that document on June 1, 2021. (Dkt. 8 ¶ 93.) Cenlar maintains that it responded to the notice of error; according to Plaintiff, however, Cenlar sent its response to the wrong address. (*Id.* ¶ 94.) Plaintiff alleges that Cenlar's response did not show that Cenlar conducted the reasonable investigation required under RESPA, but instead merely stated that Cenlar required more time to respond. (*Id.*) Cenlar never followed up with the results of its investigation. (*Id.* ¶ 95.) On June 2, 2021, Plaintiff's counsel sent another notice of error to Cenlar, relating to Cenlar's failure to adequately respond to the May 27, 2021, notice of error. (*Id.* ¶ 98; *see* Dkt. 8-1, Ex. O.) Cenlar received this second notice of error on July 8, 2021, but failed to respond in any meaningful way. (Dkt. 8 ¶¶ 99–100.)

With respect to CitiMortgage, Plaintiff alleges that CitiMortgage hired Cenlar to service various loan portfolios, including Plaintiff's. (*Id.* ¶ 101.) Plaintiff alleges that CitiMortgage authorized, directed, and ratified Cenlar's actions taken in

connection with the services performed for and on behalf of CitiMortgage. (*Id.* ¶ 104.) Specifically, CitiMortgage caused Cenlar to (1) modify Plaintiff's loan in a manner that did not cure the escrow issues and against Fannie Mae guidelines; (2) fail to correct its errors in the loan modification; (3) improperly respond to the Notice of Error and Qualified Written Request; (4) fail to respond to the second Notice of Error; (5) charge exorbitant and repetitive fees to Plaintiff's account; (6) fail to timely credit payments to Plaintiff's account; (7) charge increasing late fees to Plaintiff's account; and (8) service improperly Plaintiff's mortgage loan. (*Id.* ¶ 106.) Plaintiff further alleges that CitiMortgage caused Plaintiff's damages by failing to constrain Cenlar's actions. (*Id.* ¶ 107.) Plaintiff contends that, because CitiMortgage controlled and directed Cenlar, CitiMortgage is vicariously liable for the actions of CitiMortgage's employee's representatives, subcontractors, and agents. (*Id.* ¶ 109.)

Plaintiff filed a complaint on June 18, 2021, followed by the First Amended Complaint (Dkt. 8) on September 20, 2021. Defendants both filed motions to dismiss (Dkt. 9; Dkt. 20), which are now fully briefed. (Dkt. 21; Dkt. 24.)

## II.   LEGAL STANDARD

A motion under Rule 12(b)(6) "challenges the sufficiency of the complaint to state a claim upon which relief can be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). Each complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to

raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although legal conclusions are not entitled to the assumption of truth, *Iqbal*, 556 U.S. at 678–79, the Court, in evaluating a motion to dismiss, must accept as true the complaint's factual allegations and draw reasonable inferences in the plaintiffs' favor. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal punctuation omitted).

## III. DISCUSSION

Plaintiff's Complaint asserts five separate claims. Plaintiff brings a TILA claim (Count I) against CitiMortgage, a RESPA claim against Cenlar (Count II), a negligence claim against Cenlar (Count III), an ICFA claim against both Cenlar and CitiMortgage (Count IV), and an FDCPA claim against Cenlar (Count V). (Dkt. 8 at 19–34.) Defendants CitiMortgage and Cenlar moved to dismiss each of the claims against them. (Dkt. 9; Dkt. 20.) Each of Plaintiff's claims is examined in turn.

### A. Truth in Lending Act (TILA) Claim Against CitiMortgage

Plaintiff's first claim for relief arises under the Truth in Lending Act (Count I). (Dkt. 8 at 19–21.) TILA's Regulation Z requires that, for any "closed-end consumer transaction secured by a consumer's principal dwelling, a servicer shall not impose any late fee or delinquency charge for payment if: (i) Such a fee or charge is

attributable solely to failure of the consumer to pay a late fee or delinquency charge on an earlier payment; and (ii) The payment is otherwise a periodic payment received on the due date, or within any applicable courtesy period." 15 U.S.C. § 1026.36(c)(2). A servicer, however, is not liable for a TILA violation. *Iroanyah v. Bank of Am.*, 753 F.3d 686, 688 n.2 (7th Cir. 2014). Rather, the "owner of the obligation" is vicariously liable for a servicer's TILA violations. 15 U.S.C. § 1641(f); *see also Knopp v. Wells Fargo Bank, N.A.*, 2017 WL 7693399, at *6 (N.D. Ill. Jan. 30, 2017); *Consumer Solutions REO, L.L.C. v. Hillery*, 2010 WL 144988, at *3 (N.D. Cal. Jan. 8, 2010) ("[G]iven that the servicer cannot be held liable for damages for a § 1641(f)(2) violation, and the very nature of such a violation implies the debtor will not know the identity of and contact information for the owner of the note, the debtor would be left essentially without a remedy absent some form of vicarious liability.").

Plaintiff alleges in his complaint that Cenlar violated Regulation Z many times and that CitiMortgage is vicariously liable for those violations. Plaintiff contends that Cenlar failed to timely credit Plaintiff's payment to his account and charged pyramiding late fees to Plaintiff even though Plaintiff's monthly payments were sufficient to cover the principal and interest owed under the loan. (Dkt. 8 ¶¶ 126–27.) Plaintiff also alleges that Cenlar was not justified in charging late penalties for Plaintiff's failure to make payments on late fees and other charges that he claims he did not owe in the first place. (*Id.* ¶ 130.) According to Plaintiff, moreover, Cenlar's failure to timely credit Plaintiff's account with his timely payments caused him to pay more in principal and interest payments than he owed and to pay unnecessary

fees and charges that were not properly chargeable to his account. (*Id.* ¶ 131.) Plaintiff finally alleges that, on at least four occasions, Cenlar failed promptly to credit Plaintiff's periodic payments (*Id.* ¶ 132.) In Plaintiff's view, Cenlar's improper charges to his account and failure to properly and timely apply his payments violate Regulation Z. (*Id.* ¶ 133.)

Plaintiff continues that CitiMortgage is culpable for Cenlar's violations: either vicariously or through an alternative veil-piercing theory. (Dkt. 8 ¶ 3); *see also, e.g.*, *Cassese v. Wash. Mut., Inc.*, 711 F. Supp. 2d 261, 275 (E.D.N.Y. 2010) (TILA claims are allowed against a parent company based on the actions of a subsidiary "regardless of whether [the parent company] was in fact a 'creditor' as defined by TILA"); *Arlington v. Colleen Inc.*, 2000 WL 34001056, at *6 (D. Md. Aug. 7, 2000) (although individual defendants were not persons "to whom the debt . . . was initially payable on the face of the evidence of the indebtedness," plaintiffs pleaded sufficient facts that defendants were intimately involved in the creation, ownership, and operation of the corporate defendants "so as to foreclose any conclusion at this stage . . . that this is not a case justifying . . . the piercing [of] the corporate veil").

CitiMortgage argues that it is not the proper creditor under TILA, because the debt was initially payable to Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for Citibank, and was only later assigned to CitiMortgage. CitiMortgage contends that an assignee like itself "cannot be a creditor as defined by TILA" because the debt was initially payable to another entity. (Dkt. 5 at 4.)

TILA defines "creditor" as a person who:

> (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(g). Taking this language at face value means that TILA can be read to extend liability to the initial creditor only. This understanding is reflected in the Federal Reserve Board's Official Staff Commentary to Regulation Z, which provides that "[i]f an obligation is initially payable to one person, that person is a creditor, even if the obligation by its terms is simultaneously assigned to another person." 12 C.F.R. pt. 226, supp. I at 300 (2000). TILA's definition of a creditor is restrictive, "referring *only* to a person who satisfies *both* requirements of the provision." *Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 270 (4th Cir. 2008).

CitiMortgage contends that, because the debt was initially payable to MERS, and MERS is a separate entity from CitiMortgage, CitiMortgage cannot be a creditor under TILA. (Dkt. 20 at 4.) Plaintiff responds that CitiMortgage's parent, CitiBank, was the original creditor, so TILA does apply and CitiMortgage can be held liable under it. (Dkt. 23 at 2.) Plaintiff also argues that, because a creditor must be an entity that (unlike CitiMortgage) regularly extends consumer credit, MERS cannot be a creditor under TILA. (*Id.* at 3.)

Although both arguments are colorable, the plain-text approach, which aligns better with accepted principles of statutory construction, supports CitiMortgage's reading of TILA. Under the plain-text approach, courts, when "interpreting statutes,

10

first and foremost, [] give words their plain meaning unless doing so would [1] frustrate the overall purpose of the statutory scheme, [2] lead to absurd results, or [3] contravene clearly expressed legislative intent." *United States v. Vallery*, 437 F.3d 626, 630 (7th Cir. 2006); *Jefferson v. United States*, 546 F.3d 477, 483 (7th Cir. 2008) (same); *see also Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251 (2010) (courts "must enforce plain and unambiguous statutory language"). TILA's statutory language is clear: a creditor is "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). It does not matter if the obligation is later or even contemporaneously assigned to another person or entity: the person to whom the obligation is initially payable is the creditor under the terms of the statute. *See also* 12 C.F.R. pt. 226, supp. I, at 300 (2000).

This reading of TILA does not frustrate the purpose of the statutory scheme. *Vallery*, 437 F.3d at 630. As the act itself explains, TILA's purpose is to "protect . . . consumer[s] against inaccurate and unfair credit billing and credit card practices" and to promote "the informed use of credit" by "assur[ing] a meaningful disclosure" of credit terms. 15 U.S.C. § 1601(a). It does so by imposing general liability on those the statute defines as creditors. Although failing to include entities like CitiMortgage in the statutory definition of "creditor" might make TILA's consumer protection scope less comprehensive, TILA still protects consumers by imposing liability on a subset of lenders. Acknowledging the plain meaning of TILA in this way does not frustrate TILA's purpose.

Adopting the plain meaning of Section 1602(g) also does not contravene clearly expressed legislative intent. *Vallery*, 437 F.3d at 630. In *Vincent v. The Money Store*, the Second Circuit surveyed TILA's legislative history, focusing on the 1980 amendment in which Congress changed TILA's language to limit assignees' exposure to liability. 736 F.3d 88 (2d Cir. 2013). *Vincent* involved TILA claims brought against the assignee of a mortgage loan based on the plaintiffs' allegations that said assignee "had charged their accounts for fees and expenses which it had no right to collect, and had failed to refund the overcharges as required by TILA." *Id.* at 95. The district court dismissed the TILA claims, finding that the assignee did not qualify as a "creditor" within the statutory definition. On appeal, the Second Circuit agreed. *Vincent* observed that TILA "imposes general liability only on creditors and greatly circumscribes the liability of assignees," using a "restrictive and precise" definition of "creditor." *Id.* at 105. After surveying the Federal Reserve Board's Regulation Z, applicable case law, and the statutory language itself, *Vincent* agreed with the district court that the assignee was not a "creditor" under the clear definition in TILA, and therefore could not be liable under the specific TILA section at issue (which imposed certain responsibilities on "creditors"). *Id.* at 105–07. As for the plaintiff's argument that it was unfair to allow an assignee to get away with a violation for which the original creditor would have been exposed to TILA liability had it retained the loan, the Second Circuit disagreed:

> We may think it unwise to allow an assignee to escape TILA liability when it overcharges the debtor and collects unauthorized fees, where the original creditor would otherwise be required to refund the debtor promptly. But such a result is not 'absurd.' We will not rewrite the text

> of the statute, nor will we refuse to defer to the Federal Reserve's consideration of the liability of assignees in Regulation Z. We note this discrepancy, however, for the benefit of Congress and the Federal Reserve. . . . For the reasons stated above, The Money Store is not a 'creditor' under TILA and the district court correctly dismissed the plaintiffs' TILA claims.

*Vincent*, 736 F.3d at 109. Post-amendment, TILA imposed liability on an assignee "only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement." *Taylor v. Quality Hyundai, Inc.*, 150 F.3d 689, 692 (7th Cir. 1998) (quoting 15 U.S.C. § 1641(a)). Before the 1980 amendment, "the statutory provisions that assured transfer of the forms containing the TILA disclosures to the assignee also made it possible for the debtor to claim that the assignee had 'knowledge' of the violation." *Id.* at 693. To eliminate confusion as to the liability of assignees, Congress "simplifie[d] the definition of 'creditor.' " S. Rep. No. 96–368, at 24 (1979), 1980 U.S.C.C.A.N. 280, 287. In its initial Report accompanying the amendments to TILA, the Senate Banking, Housing, and Urban Affairs Committee explained:

> This [amendment] eliminates two uncertainties under present law as to an assignee's liability for an original creditor's violation of the act. Under present law, an assignee is generally liable only where a violation is 'apparent on the face' of the disclosure statement. What types of violations are covered is unclear. This section provides that violations are apparent on the face of a disclosure statement when disclosures are inaccurate or incomplete based on the statement or other documents involved, and where incorrect terminology is utilized.

> In addition, this section eliminates ambiguity on the question of assignee liability for rescission by stating explicitly that a consumer's exercise of this right is effective against an assignee. Without such protection for the consumer, the right of rescission would provide little or no effective remedy.

S. Rep. No. 96–73, at 18 (1979), 1980 U.S.C.C.A.N. 280, 296. All of this legislative

history (to the extent it is pertinent) suggests that, when Congress amended TILA and limited liability for assignees by defining creditor as the person or entity "to whom the debt arising from the consumer credit transaction is initially payable," it intended to limit the liability an assignee could face. By excluding assignees from the definition of creditor without making a separate liability regime for assignees, Congress did not intend for assignees to nonetheless be covered by TILA. Adopting the plain text meaning thus does not contravene explicit legislative intent.

Plaintiffs' argument highlights a possible flaw in TILA as it is written today. In Count I of the Amended Complaint, Plaintiff alleges that CitiMortgage "failed to timely credit Plaintiff's payments to his account." (Dkt. 8 at 20.) Plaintiff's claim tracks Section 1666d of TILA, which requires a creditor to "credit the amount of [any] credit balance [over $1] to the consumer's account" and "refund any part of the amount of the remaining credit balance, upon request of the consumer." 15 U.S.C. § 1666d(A)–(B). Unlike the majority of TILA's provisions, which require certain disclosures to debtors only at the time of a loan's execution, Section 1666d applies throughout the life of the loan, not just at the time of execution. Indeed, Section 1666d cannot logically apply only to the time of execution, considering a debtor has not yet made any payments.

Given that Section 1666d, on its face, must apply throughout the life of the loan (not only to the time of a loan's execution), it makes little sense to apply Section 1666d to the original creditors alone and exempt assignees. As CitiMortgage admits, an assignee's failure to timely credit a debtor's account cannot appear on the face of

a disclosure. (Dkt. 20 at 4–5.) ("[F]ailure to timely credit payments would not appear in the disclosure statement."). But that is the statute as written, and although confusing, it does not rise to the level of absurdity required to ditch the plain-text approach; this Court cannot rewrite the statute and contradict Congress and the Federal Reserve's commentary in Regulation Z.

Because applying the plain meaning here does not frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent, *see Vallery*, 437 F.3d at 630, the Court adopts the plain meaning of TILA's text. The relevant text defines creditor narrowly, covering only those who regularly extend consumer credit, payable in four or more installments, and to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or by agreement. 15 U.S.C. § 1602(g). CitiMortgage does not meet that definition because it was not the entity to whom the debt arising from the consumer transaction was initially payable. Based on the plain text of TILA, then, CitiMortgage—nominally—is not the creditor in Plaintiff's consumer credit transaction.

But that is not the end of the inquiry, as Plaintiff also argues that, under a theory of vicarious liability, CitiMortgage should still be held liable under TILA as Cenlar's alter ego. (Dkt. 23 at 9.) Plaintiff rejects CitiMortgage's claim that, because it is a separate legal entity from Citibank, it cannot be held vicariously liable under TILA. (*Id.* at 3.) Although the Seventh Circuit has not decided this issue, other district courts have permitted the veil–piercing theory in a TILA context. *See, e.g.*,

*Ward v. Shad*, 2019 WL 1084219, at *5 (D. Minn. Mar. 7, 2019) (noting that the plaintiff "has pled facts sufficient under *Twombly* and *Iqbal* that both Defendants are plausibly creditors under TILA, regardless of who is listed as the seller on the contract for deed"); *Cassese v. Wash. Mut., Inc.*, 711 F. Supp. 2d 261, 275 (E.D.N.Y. 2010) (allowing class plaintiffs to assert a TILA claim against a parent–company based on actions of its subsidiary, "regardless of whether [parent–company] was in fact a 'creditor' as defined by TILA."); *Longo v. First Nat'l Mortg. Sources*, 2010 WL 415330, at *2–4 (D.N.J. Jan. 29, 2010); *Arrington v. Colleen Inc.*, 2000 WL 34001056, at *6 (D. Md. Aug. 7, 2000) (despite that the individual defendants were not the persons "to whom the debt . . . was initially payable on the face of the evidence of the indebtedness," plaintiffs alleged sufficient facts that defendants were intimately involved in the creation, ownership, and operation of the corporate defendants "so as to foreclose any conclusion at this stage . . . that this is not a case justifying . . . the piercing [of] the corporate veil").

It is unnecessary at this point to decide whether Defendants are, in fact and law, creditors under the corporate veil-piercing theory. Plaintiff has sufficiently alleged an intent to pierce the corporate veil by asserting that "Cenlar's employees, representatives[,] and/or agents were acting at the control and direction of CitiMortgage, which is vicariously liable for the actions of CitiMortgage's employees, representatives, subcontractors, and/or agents." (Dkt 8 at 17.) Put another way, Plaintiff has plausibly alleged, through a veil-piercing theory, that both Defendants fulfill the second prong of TILA's creditor definition; this aspect of the Complaint

must therefore survive. *See Twombly*, 550 U.S. at 555–56. CitiMortgage's motion to dismiss Count I is denied.

### B.    RESPA Claim Against Cenlar

In Count II of the Amended Complaint, Plaintiff alleges that Cenlar violated RESPA. (Dkt. 8 ¶¶ 136–51.) RESPA requires that "if any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent or the borrower) for information relating to the servicing of such loan), the servicer shall provide a written response acknowledging receipt of the correspondence within 5 days . . . unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A). After receipt is acknowledged, the servicer must then either make the appropriate corrections or, after conducting an investigation, provide the borrower with a written explanation or clarification explaining why the borrower's account is correct or why the information the borrower requests is unavailable.[1] 12 U.S.C. § 2605(e)(2).

Plaintiff alleges that Cenlar failed to respond in a timely way to Plaintiff's qualified written requests, in violation of Section 2605(e)(2)(A). (Dkt. 8 ¶ 142.) Cenlar

---

[1] "Not later than 30 days . . . after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall": (A) "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower)"; (B) "after conducting an investigation, provide the borrower with a written explanation or clarification that includes— (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and (ii) [name, number, etc.]."; or (C) "after conducting an investigation, provide the borrower with a written explanation or clarification that includes— (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer." 12 U.S.C. § 2605(e)(2).

responds that its acknowledgement of receipt, sent June 2, 2021, satisfies Section 2605(e)(1)(A) despite being sent to the wrong address. (Dkt. 9 at 4; Dkt.9-1.) Cenlar also contends that its June 16 letter satisfies Section 2605(e)(2): it sent that letter within the thirty-day window and informed Plaintiff that there was a delay, which it asserts qualifies as an "explanation" for why the information Plaintiff sought was unavailable under Section 2605(e)(2)(C). (Dkt. 21 at 2–3.) Plaintiff disagrees, arguing that Cenlar's obligations under the statute require the response to substantively reply to the content and queries of the letter. (Dkt. 19 at 4–7.) Plaintiff argues that a response containing information that there is a "delay" with no other context fails to satisfy the statutory requirement for "an explanation of why the information requested is unavailable or cannot be obtained by the servicer." 12 U.S.C. § 2605(e)(2)(C). (Dkt. 19 at 6–7.)

Cenlar relies on *Walton v. BMO Harris Bank, N.A.* to support dismissal, but unlike the purely statutory harm alleged in that case, Plaintiff here alleges a concrete harm. 761 F. App'x 589 (7th Cir. 2019). In *Walton*, the plaintiff's only alleged injury was failure to timely respond to the plaintiff's qualified written request by the servicer. *Id.* at 592–93. By contrast, Plaintiff alleges that he "suffered actual damages" in the form of ruined credit as a result of Cenlar's alleged RESPA violations. *Id.* at 592. Moreover, unlike the plaintiff in *Walton*, Plaintiff alleges that the RESPA violations caused financial institutions to reject credit for a car loan and a loan application intended for continuing education in addition to other damages. (Dkt. 8 ¶ 120.)

18

Given the alleged damages, the text of Section 2605(e)(2) required an actual response rather than the notice of delay that Cenlar provided. Even if Cenlar's explanation that it would be delayed in providing a more fulsome explanation sufficed to meet Section 2605(e)(2)(C), lack of investigation itself can give rise to a RESPA claim under Section 2605(e)(2)(B) and (C)—as another court in this District previously found. In *Saccameno v. Ocwen Loan Servicing, LLC*, the court ruled that a RESPA defendant's single response to two qualified written requests relating to loan refinancing, incorrect payment processing, and a home mortgage did not meet the statutory standards. 372 F. Supp. 3d 609, 639 (N.D. Ill. 2019). *Saccameno* noted that the defendant responded, acknowledged that the plaintiff received the response, and acknowledged that defendant had provided a partial remedy in the form of a partial fee waiver. *Id.* But *Saccameno* further explained that "there is sufficient evidence [defendant] failed both to conduct a sufficient investigation and to provide an adequate explanation as to why [plaintiff]'s account needed no correction." *Id.* Indeed, with "respect to the adequacy of [defendant]'s investigation . . . by the time it sent its [dated] response letter, [defendant] had all the information necessary to determine that [plaintiff] had in fact made all . . . of her [required] payments." *Id.* Given the information available to the defendant at the time of the plaintiff's inquiry, the *Saccameno* court asked why "[defendant] offer[ed] no explanation as to why it responded by telling [plaintiff] that her loan was delinquent. In the absence of an alternative explanation, a jury could reasonably have concluded that [defendant]'s mistaken response resulted from its failure to investigate [plaintiff]'s account." *Id.*

19

Plaintiff's situation is similar to that of the plaintiffs in *Saccameno*. Plaintiff has plausibly claimed that Cenlar failed to fulfill its statutory obligation to investigate and respond to Plaintiff's qualified written request under RESPA: Plaintiff alleged that Cenlar told Plaintiff that it needed more time to complete its investigation and never followed up with the results to that investigation in response to Plaintiff's first Qualified Written Request.

Plaintiff's alleged injury goes beyond Cenlar's mere alleged failure to investigate. Plaintiff alleges that Cenlar also violated Section 2605(e)(3) by wrongly reporting to consumer reporting agencies that Plaintiff was delinquent on overdue payments, as related to his May 27th Notice of Error and July 2nd Notice of Error. (Dkt. 8 ¶¶ 145, 147.) Under Section 2605(e)(3), a servicer may not provide information regarding any overdue payment relating to a borrower's qualified written request within a "60-day period beginning on the date of the servicer's receipt . . . of a qualified written request relating to a dispute regarding the borrower's payments." 12 U.S.C. § 2605(e)(3).

Plaintiff plausibly alleges that Cenlar may have committed a RESPA violation under Section 2605(e)(3) by reporting Plaintiff's supposed delinquencies to outside consumer reporting agencies. As such, and taking all facts in the light most favorable to Plaintiff, Plaintiff has stated a plausible claim in Count II of the Amended Complaint for relief under Section 2605(e)(3). Cenlar's motion to dismiss Count II is therefore denied.

### C.     Negligence Claim Against Cenlar

Although both Cenlar and CitiMortgage moved to dismiss Count III, Plaintiff only asks for relief on this count against Cenlar, (*see* Dkt. 8 at 24); the Court therefore only discusses Cenlar's motion to dismiss the negligence claim. At issue is whether Plaintiff can recover for Cenlar's alleged breach of its fiduciary duty to Plaintiff. To resolve this dispute, the Court must consider whether the *Moorman* doctrine applies to Plaintiff's Count III claim. *Moorman* bars recovery in tort for purely economic losses arising out of a failure to perform contractual obligations. *Moorman Manufacturing Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982); *see also Wigod v. Wells Fargo Bank, N.A.*, 673 F.2d 547, 567 (7th Cir. 2012). There are, however, exceptions to this rule that arise when an extra-contractual duty exists between the parties, thus creating a cause of action in tort separate from any cause of action based on the contract itself. *See Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011) (denying the existence of an extracontractual duty on grounds that duty was rooted in note-and-mortgage contract).

Plaintiff alleges that Cenlar breached a fiduciary duty to Plaintiff by charging him amounts that he did not owe, failing to credit his payments to his account, disregarding Plaintiff's statements that he had been unfairly charged, ignoring Plaintiff's Notice of Error, by harassing and intimidating Plaintiff, and placing Plaintiff's loan in loss mitigation status under false pretenses. (Dkt. 8 ¶ 155.) Plaintiff thus contends that Cenlar's actions are the direct and proximate cause of monetary damages as well as pain and suffering. (*Id.* ¶¶ 156–57.)

Cenlar's response to Plaintiff is unconvincing. Cenlar counters that the duties Plaintiff alleges Cenlar owes—to service the loan in conformity with federal and state laws and to properly manage his escrow account (*Id.* ¶¶ 153–54)—arise out of the note-and-mortgage contract. (Dkt. 21 at 5.) Cenlar argues that, because there is no duty to service the loan or to manage the escrow account without the existence of the contract, any duty relating to the loan or to the management of the escrow account necessarily arises out of the contract. (Dkt. 9 at 5.) But to accept Cenlar's argument would preclude finding an extracontractual duty whenever a contract exists. Extending the *Moorman* doctrine to extracontractual fiduciary duties associated with contractual relationships, as Defendant suggests, would extinguish those duties.

As Plaintiff correctly notes, fiduciary duties separate from the parties' contractual duties can and do arise even when the parties are bound to a contract. Illinois law is clear that the presence of such a fiduciary duty is an explicit exception to the *Moorman* doctrine's bar to economic loss liability for negligence. *See Catalan*, 629 F.3d at 693. For example, "mismanagement of an escrow account may give rise to a cause of action for a breach of fiduciary duty." *Choi v. Chase Manhattan Mortgage Co.*, 63 F. Supp. 2d 874, 885 (N.D. Ill. 1999); *see also Ploog v. Homeside Lending, Inc.*, 209 F. Supp. 2d 863, 874–75 (N.D. Ill. 2002) (denying lender's motion to dismiss borrower's negligence claim because lender's duty to manage escrow funds properly could give rise to fiduciary relationship between lender and borrower); *Reda v. Nationstar Mortg., LLC*, 2020 WL 7353410, at *3 (N.D. Ill. Dec. 15, 2020) ("[E]scrow accounts are in *addition* to the mortgagor-mortgagee relationship and, at least in the

pleading stage, confer a fiduciary-like duty upon the Defendant.").

Cases in this district explain that mismanagement of an escrow account is not limited to such acts as a loan servicer improperly spending escrow funds. Rather, mismanagement of an escrow account is a broad concept that requires "the mortgagee to exercise its discretion 'reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties.' " *Poindexter v. Nat'l Mortg. Co.*, 1995 WL 242287, at *4 (N.D. Ill. Apr. 24, 1995). Mismanagement of an escrow account includes lodging excessive charges to an escrow account. *Vician v. Wells Fargo Home Mortg.*, 2006 WL 694740, at *8 (N.D. Ind. March 16, 2006) ("Defendant breached its fiduciary duties by charging excessive force-placed insurance premiums and finance charges to Plaintiffs' escrow account."). In the context of these cases, *Moorman* does not bar Plaintiff's claim against Cenlar.

*Catalan* sets a strict bar as to what constitutes a fiduciary duty to qualify as an exception under the *Moorman* doctrine. (*See* Dkt. 21 at 4–5.) Defendant argues that Plaintiff has failed to clear this bar, and thus the *Moorman* doctrine precludes Plaintiffs' recovery. Plaintiff cites to two cases that, he contends, show he has cleared the bar: *Choi* and *Ploog*, which stand for the proposition that a fiduciary relationship plausibly exists when there is a mortgage contract and a defendant mismanages the escrow account. (Dkt. 19 at 12); *see also generally Choi*, 63 F. Supp. 2d 874; *Ploog*, 209 F. Supp. 2d 863. Cenlar fails to distinguish this authority.

Plaintiff's negligence claim is similar to the negligence claim in *Choi*, which survived the motion to dismiss stage. In *Choi,* a borrower entered contracts with a

23

mortgage lender under which the borrower paid monthly sums into an escrow account. *Id.* at 878–79. The plaintiffs alleged that the lender provided wrong information regarding the mortgage property and failed to rectify delinquent tax obligations and paperwork errors. *Id.* at 879. Due to this escrow mismanagement, the plaintiffs lost their home. *Id.*; *see also id.* at 885. The plaintiffs alleged negligence, arguing that the lender's duty to manage escrow funds gave rise to a fiduciary relationship between lender and borrower. *Id.* at 883. The court agreed with the plaintiffs that a fiduciary relationship plausibly existed and denied the lender's motion to dismiss. *Id.* at 885, 888.

*Ploog* is similar to *Choi.* 209 F. Supp. 2d 863. In *Ploog*, the plaintiff sued her loan servicer for improper balance calculations associated with her mortgage. *Id.* at 866. The plaintiff called the loan servicer multiple times and sent multiple letters asking for the errors to be corrected and asking the loan servicer to stop allocating her payments to the wrong accounts. *Id.* But the loan servicer did not substantively respond to her inquiries or correct the reported problems. *Id.* On the contrary, the loan servicer began charging the plaintiff incorrect escrow and late fees and threatening her with actions such as reporting the plaintiff to the credit bureau "if she did not bring her loan current." *Id.*

*Ploog* is instructive. In *Ploog*, the defendant moved to dismiss the plaintiff's negligence claim, arguing the same economic loss exception under the *Moorman* doctrine as Defendant. *Id.* at 874. *Ploog's* defendant argued that no fiduciary duty exists separate from the contractual relationship. *Id.* at 874–75. But the court

disagreed and explained that, if a fiduciary relationship arises outside of the contract at issue, then it constitutes an exception to *Moorman. Id.* at 875. Mortgages, explained the court, carry with them an implied fiduciary duty that arises outside of the contract. *Id.* The court thus held that the mortgage contract clearly "gave rise to a fiduciary relationship between [defendant] and [plaintiff], which makes the *Moorman* doctrine inapplicable." *Id.*

In any event, at the pleadings stage, "Plaintiffs do not need to plead the special facts which give rise to a fiduciary relationship." *Vician*, 2006 WL 694740, at *8. Plaintiff is required only to provide fact sufficient to show that a fiduciary relationship could plausibly exist, and Plaintiff has done so. Thus, as to Cenlar, taking all facts in the light most favorable to Plaintiff, Plaintiff has stated a claim that cannot be dismissed at this stage.

### D.    ICFA Claim Against Cenlar and CitiMortgage

In Count IV, Plaintiff alleges that Cenlar and CitiMortgage violated ICFA. (Dkt. 8 at 25.) ICFA makes it unlawful for a defendant to engage in a deceptive or unfair act or practice in commerce. 815 ILCS 505/2; *Totz v. Continental Du Page Acura*, 602 N.E.2d 1374, 1380 (Ill. App. Ct. 1992). To successfully bring an ICFA claim, Plaintiff must present facts demonstrating (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the defendant's deception; (3) that the deception occurred in the course of trade or commerce; and (4) that the consumer fraud proximately caused the plaintiff's injury to assert a claim under ICFA. *Rickler v. Home Depot, Inc.*, 535 F.3d 661, 665 (7th Cir. 2008). An unfair

practice is one that (a) "offend[s] public policy", (b) is "immoral, unethical, oppressive, or unscrupulous," or (c) "cause[s] substantial injury to consumers." *Id.* (citing *White v. DaimlerChrysler Corp.*, 368 N.E.2d 584, 593 (1996)). Determining what constitutes unfair practice is a balancing test—the increased presence of one element lowers the threshold needed for the others. *Id.*

Plaintiff alleges that Defendants, by improperly servicing a loan in violation of RESPA and TILA, making negative reports to a credit reporting agency in violation of the FCRA, and failing to investigate, respond to, and address servicing errors contravened Federal and Illinois law and internal and regulatory guidelines. (Dkt. 8 ¶¶ 173, 176.) Plaintiff alleges that Cenlar deliberately bullied and intimidated Plaintiff into abandoning his rights to his home so that it could be sold as collateral, with proceeds used to satisfy incorrect amounts alleged to be outstanding on the loan. (*Id.* ¶ 172.) More specifically, Plaintiff argues that Cenlar demonstrated a repeat practice of failing to properly allocate periodic payments; sending periodic statements to Plaintiff containing invalid fees and charges and improperly calculated interest, while making demand for payments Plaintiff had already made. (*Id.* ¶ 188.) Plaintiff further alleges that both Defendants intended Plaintiff to rely on those actions, causing him to give up his home so that Cenlar could sell it for CitiMortgage's benefit. (*Id.* ¶ 190.) Plaintiff contends that Defendants' normal business practices are designed to disregard the law, ignore possessory and ownership rights of consumers, and profit from initiating foreclosure proceedings to coerce a borrower into giving up his property rights in his personal and real property when such action is

unwarranted. (*Id.* ¶ 177.)

In seeking dismissal of Count IV, Defendants first assert a preemption argument. According to Defendants, Plaintiff may not argue duplicative RESPA and TILA claims under ICFA because duplicative state law-based claims are preempted by statute. *See* 15 U.S.C. § 1681t(b)(1); *Geske v. Fannie Mae*, 2015 WL 1397087 (N.D. Ill. March 25, 2015). Section 1681t, however, merely describes the relationship between the Fair Credit Reporting Act and state laws regulating consumer credit reporting; it does not clearly bar Plaintiff's ICFA claim. *See Wigod*, 673 F.3d at 574–76 ("[L]aws of general applicability survive preemption so long as they do not effectively impose standards that conflict with federal ones."). Defendants' preemption argument therefore fails.

Defendants' opposition to the ICFA claim is not limited to preemption; Defendants also argue that Plaintiff relies on a broad interpretation of ICFA that other courts in this District have previously rejected. (Dkt. 9 at 8; Dkt. 20 at 7–8); *See also*, *e.g.*, *Geske*, 2015 WL 1397087, *Gritters v. Ocwen Loan Servicing, LLC*, 2018 WL 1784134 (N.D. Ill. Apr. 13, 2018). As Defendants explain, a valid ICFA claim requires that Plaintiff allege "unfair or deceptive conduct [that is] distinct from the alleged breach of a contractual promise" and which "involves more than the mere fact that a defendant promised something and then failed to do it." *Geske*, 2015 WL 1397087, at *2 (quoting *Greenberger v. Geico Gen. Ins. Co.*, 631 F.3d 392, 399 (7th Cir. 2011) and *Zankle v. Queen Anne Landscaping*, 311 Ill. App. 3d 308, 312 (Ill. App. Ct. 2d Dist. 2000)). For the reasons that follow, the Court agrees that Plaintiff's allegations do

27

not state a claim under ICFA as to either Defendant.

### 1. Cenlar

ICFA has "broad applicability" under Illinois law. *Scott v. Assoc. for Childbirth at Home, Int'l*, 430 N.E.2d 1012, 1015 (Ill. 1981). ICFA, however, is "not intended to apply to every contract dispute or supplement every breach of contract claim with a redundant remedy," or, indeed, an alternative one. *Golbeck v. Johnson Blumberg & Assocs., LLC*, 2017 WL 3070868, at *12 (N.D. Ill. July 19, 2017) (quoting *Greenberger*, 631 F.3d at 399) (cleaned up). As other courts in this District have held, allegations stemming from the mortgage-contract relationship are not the type of unfair or deceptive conduct that gives rise to a successful ICFA claim. Indeed, in cases concerning unresponsive or error-riddled loan servicers, those courts have *specifically* held, at the pleading stage, that such scenarios could not state an ICFA claim. *See*, *e.g.*, *Geske*, 2015 WL 1397087, at *5; *Gritters*, 2018 WL 1784134, at *15, *17.

*Geske*, for example, involved an ICFA allegation that the defendant "induc[ed] [P]laintiffs to make a large payment on a discharged debt by promising to modify their mortgage, and then fail[ed] to promptly and properly credit the payment and/or properly implement the loan modification." 2015 WL 1397087 at *3. In dismissing the case for failure to state a claim, the court stated that "[t]his allegation is simply another way of stating Plaintiffs' breach of contract claim—in particular, that Defendant falsely promised to modify Plaintiff's loan if they made the down payment, and that despite Plaintiff's performance . . . [,] Defendant did not hold up its end of the bargain . . . . [A] recital of a breach of contract claim is not sufficient to state a

violation of the ICFA." *Id. Geske* is instructive and supports the dismissal of Count IV. Plaintiff's decision not to bring a separate contract breach claim is insufficient to distinguish this case from *Geske*; that Plaintiff failed to bring the more appropriate claim does not bring this claim within the bounds of ICFA.

Plaintiff must do more than merely allege errors and unresponsiveness by a loan servicer to bring a claim within ICFA. *See id.* Plaintiff failed to include factual allegations "that state or indicate that Defendant's failures violated public policy or rose to the level of oppressive or coercive conduct." *Id.* And Plaintiff's specific allegations similarly fail to fall within the bounds of ICFA. Misrepresentations about the status of a loan, and even of a possible foreclosure, do not give rise to a claim under ICFA. *See Gritters*, 2018 WL 1784134, at *14.

Even if Cenlar's conduct is unsavory, it does not rise to the level of being actionable under ICFA. As to Cenlar, therefore, even taking all facts in the light most favorable to Plaintiff, Plaintiff has not stated a claim that can survive the pleading stage. Plaintiff's ICFA claim against Cenlar is thus dismissed.

## 2. CitiMortgage

Plaintiff argues that CitiMortgage is liable for Cenlar's misbehavior under an agency theory. (*See* Dkt. 8 ¶ 168.) Plaintiff alleges that Cenlar acted as the agent of CitiMortgage and dealt with Plaintiff directly on CitiMortgage's behalf. In other words, but for CitiMortgage's relationship with Plaintiff, Cenlar would have no interest or purported right to perform services related to the loan, the property, or Plaintiff. (*Id.* ¶¶ 166, 169–70.)

Under Illinois law, "where an assignee is free from liability under federal law, the assignee is free from liability under ICFA." *Jenkins v. Mercantile Mortg. Co.*, 231 F. Supp. 2d 737, 747 (N.D. Ill. 2002) (citing *Jackson v. South Holland Dodge, Inc.*, 744 N.E.2d 462, 469–70 (Ill. 2001)). Assignee liability "hinges on whether a plaintiff alleges that the assignee 'directly participated in a scheme' . . . . ICFA does not provide a cause of action for knowing receipt of benefits in violation of the Act." *Id.* at 748 (internal citations omitted). That rule does not provide a "blanket immunization" for assignees under ICFCA; so long as the assignee's "fraud is active and direct," a plaintiff can maintain a cause of action under ICFA. *Id.* at 748 (dismissing the ICFA claim against an assignee due to lack of allegations relating to participation in an *active* scheme).

CitiMortgage contends that, as assignee, it cannot be liable under Illinois law. (Dkt. 20 at 7.) In doing so, CitiMortgage implicitly argues that its involvement here was not "active and direct," but rather that CitiMortgage merely passively received the benefits of whatever improper actions Cenlar may have taken. (*Id.*)

As it stands, Plaintiff failed to state a claim as to Cenlar, so there can be no agency liability for CitiMortgage. *See United Fire & Cas. Co. v. Prate Roofing & Installations, LLC*, 7 F.4th 573, 585 (7th Cir. 2021) ("Put differently, if the agent has no liability, there is nothing to impute to the principal."). But even if Plaintiff had stated a claim as to Cenlar, CitiMortgage's argument under *Jenkins* and *Jackson* would prevail. CitiMortgage took no active role in any of the behavior Plaintiff alleges to be violations of ICFA. As to CitiMortgage, therefore, taking all facts in the light

most favorable to Plaintiff, Plaintiff has not stated a claim that can survive the pleading stage. Plaintiff's ICFA claim against CitiMortgage is dismissed.

### E. FDCPA Claim Against Cenlar

The FDCPA provides that "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. As is relevant here, the FDCPA makes unlawful "[t]he false representation of . . . the character, amount or legal status of any debt," Section 1692e(2); "[t]he threat to take any action that cannot be legally taken or that is not intended to be taken," (§ 1692e(5)); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer," (§ 1692e(10)).

In *Gbruek v. Litton Loan Servicing LP*, the Seventh Circuit identified three factors that courts should consider when analyzing whether the FDCPA applies to a communication: (1) the presence or "absence of a demand for payment"; (2) the "nature of the parties' relationship"; and (3) the "purpose and context of the communications—viewed objectively." 614 F.3d at 385. That objectivity is clearly met if the defendant "expressly demanded payment of a disputed debt." *Leeb*, 2013 WL 6169408, at *3–4. Cenlar made such an express demand. In addition, Cenlar is a debt collector and acted in connection with the collection of Plaintiff's debt—thus satisfying threshold inquiry to permit an FDCPA claim. *See Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 384 (7th Cir. 2010).

Whether Cenlar sent a communication "in connection with the collection of a

31

debt"—the second and final requirement to trigger the FDCPA—is an objective inquiry. *Id.*; *see also Ruth v. Triumph P'ships*, 577 F.3d 790, 798 (7th Cir. 2009). That inquiry asks whether, from the perspective of a reasonable consumer, the communication was sent in connection with the collection of a debt. *See Preuher v. Seterus, LLC*, 2014 WL 7005095, at *2–3 (N.D. Ill. Dec. 11, 2014); *Leeb v. Nationwide Credit Corp.*, 2013 WL 6169408, at *3 (N.D. Ill. Nov. 21, 2013), *aff'd sub nom.*, 806 F.3d 895 (7th Cir. 2015).

Plaintiff alleges that Cenlar's alleged threat of foreclosure violates the FDCPA because the action could not legally be taken and represented a threat to take away his home. (Dkt. 8 ¶¶ 205–06.) But *Carlvin v. Ditech Financial LLC* explained that a factual, conditional statement "is not a legal impossibility, and instead is an accurate description of a potential outcome of Plaintiff's [course of action]." 237 F. Supp. 3d 753, 758–59 (N.D. Ill. 2017) (rejecting plaintiff's argument that "under the FDCPA, a conditional statement, while factually true, can still be misleading if it fails to clarify the circumstances under which a consequence may occur").

Plaintiff's allegation that Cenlar's incorrect statements concerning the amount and legal status of the debt violates the FDCPA is mistaken. (Dkt. 8 ¶¶ 199–200.) Falsity of a statement alone is insufficient to state an FDCPA claim; a Plaintiff bears the burden of showing that a false or material statement would deceive an unsophisticated consumer. *Ruth*. 577 F.3d at 799–800. Plaintiff has not alleged sufficient facts to demonstrate that the communication deceived him. On the contrary, in response to every purportedly false communication, Plaintiff took steps

32

to communicate with Cenlar as to his problems with the communications' perceived errors.

In the cases where courts have allowed FDCPA claims resting on similar bases to proceed past the pleadings stage, the dispute involved the essential, egregious additional detail that the loan servicer had accelerated the loan, demanding its payment in full and charging late fees on that demand. *See, e.g.*, *Pagan v. Rushmore Loan Management Services LLC*, 2020 WL 7398788 (N.D. Ill. Dec. 17, 2020); *Dawoudi*, 448 F. Supp. 3d 918. And the Seventh Circuit has noted that intangible injuries, such as "psychological states induced by a debt collector's letter" and emotional harm, do not give rise to a cause of action under the FDCPA. *Pierre v. Midland Credit Management, Inc.*, 29 F.4th 934, 939 (7th Cir. 2022). Any anxiety caused to Plaintiff by the threat of the loss of his home, therefore, is not a cognizable injury under the FDCPA. *Id.*

Plaintiff's allegations fail to give rise to false or material misrepresentation in connection with a debt that would mislead an unsophisticated consumer in accordance with the Seventh Circuit's standard under *Ruth*. 577 F.3d at 799–800. Accepting as true that the loan modification and escrow errors were handled poorly is not actionable—even if Cenlar representatives made false statements. Taking all facts in the light most favorable to Plaintiff, Plaintiff has not stated a plausible claim. Plaintiff's Count V is dismissed.

33

## IV. CONCLUSION

CitiMortgage's motion to dismiss as to the TILA claim (Count I) is denied; Cenlar's motion to dismiss as to the RESPA claim (Count II) is denied; Cenlar's motion to dismiss the negligence claim (Count III) is denied; CitiMortgage's motion to dismiss as to the negligence claim (Count III) is granted without prejudice; CitiMortgage's and Cenlar's motions to dismiss the ICFA claims (Count IV) are granted without prejudice; and Cenlar's motion to dismiss the FDCPA claim (Count V) is granted without prejudice.

SO ORDERED in No. 21-cv-03271.

Date: August 7, 2024

_____
JOHN F. KNESS
United States District Judge